## BROWN v. FINN.

*(Circuit Court, D. Colorado.   March 6, 1888.)*

BANKS AND BANKING—STOCKHOLDERS—TRANSFER OF STOCK TO DIRECTOR WITH-
OUT HIS KNOWLEDGE—FAILURE TO REPUDIATE.

Where a man, elected a director and vice-president, and assuming the active
management of a bank, being bound by a statute to own a certain number of
shares, and presumed to know the condition of the books of the bank, not
only as to whether the required number of shares are held by him, but whether
there are the required number of stockholders, and who they are, does not
return a dividend paid him by the bank at a time when it was insolvent, upon
stock transferred to him without his knowledge prior to his election as director
and vice-president, and does not repudiate the transfer, except by a return of
the dividend to the supposed owner of the shares, he must be held the owner
of the stock thus transferred to him on the books.

At Law.   On motion for new trial.

*Wolcott & Vaih*, for plaintiff.

*Parsons & Lyles* and *Patterson & Thomas*, for defendant.

HALLETT, J.   Sam Brown against Nicholas Finn is an action upon a
statute of the United States, to recover a sum due from defendant as
stockholder in the First National Bank of Leadville, and the question
which arose upon the trial and upon the motion for a new trial was whether
Finn was in fact a stockholder in that bank at the time of its failure.
Upon the facts as disclosed in evidence, the jury found a verdict, by di-
rection of the court.   It appeared in evidence that Mr. De Walt, as presi-
dent of the bank, had, at some time in the fall of 1883, transferred a
number of shares to Mr. Finn, and thereupon he became vice-president
of the bank, and entered into the active management of its affairs.   At
or about that time, Mr. Sauer, who had been cashier of the bank, re-
signed from that position, and Mr. Finn became acting cashier, although
not chosen to that position.   I believe he became a director at the same
time, as was perhaps necessary to qualify him as vice-president of the
institution.   Some time later,—a month or two perhaps,—he purchased
certain shares, 20, I think, of Mr. Sauer.   His position is, and he offered
evidence to show that at that time and afterwards until January, 1884,
he knew nothing of the matter of the transfer of shares to him by De
Walt previous to his election as a director and vice-president of the
bank.   In January, 1884, about the first of that month, he became aware
of the transfer of these shares by the circumstance that there was declared
by the board of directors a dividend of 25 per cent. upon all of the
shares, as well those which were transferred to him by Mr. De Walt as
the shares which he had purchased from Sauer, and this dividend was
put to his account.   In that way he became apprised of it.   He sought
immediately—within a few days—to repudiate the transfer of these
shares, not by having the transfer enrolled upon the books, but by in-
forming Mr. De Walt that he did not assent to that transaction, and pay-
ing to him the amount of the dividend which was attributable to those

shares. Upon these circumstances he insists that he is not to be charged in respect of the shares which came from De Walt. Admitting his liability as to the others which he obtained from Sauer, he paid to the receiver the amount coming against him under the statute upon those shares, but declined to pay the amounts which would arise, being the par value upon the shares transferred by De Walt to him; and this suit is for the amount upon those shares, and also for the dividend which was paid him on the 20 shares.

Upon these facts the question obviously turns upon whether Mr. Finn, acting as vice-president and as cashier of the bank, and active in its affairs during the time when these shares transferred to him by De Walt stood in his name upon the book, is to be charged; and if not so, whether, when he ascertained that the shares were in his name, in the early part of January, 1884, he was bound to do more than he did towards repudiating the transfer to him.

Now, upon the first proposition that he is chargeable with notice of the transfer of these shares to him, although he knew not of it, I think the principle is clear enough; and there are several authorities which sustain that view,—two in particular I have brought here.

The first is *Ex parte Brown*, 19 Beav. 97. Dr. Brown was a director of an insurance company called the "Newcastle-upon-Tyne." He had owned some shares in this company, and, as in the case of the Leadville bank, a man named William Henry Brockett had assumed chief control over the affairs of the company. In the language of counsel in discussing the case before the court, he had become the company. He was managing its concerns, and no one else who had been interested in it was giving much attention to its affairs. Dr. Brown sold his shares to Brockett, and gave him directions in respect to the transfer of them; but these directions were not carried out; and certain rules of the company—certain provisions incorporated in the certificate of incorporation—were not followed in respect to the transfer of the shares. In July, 1848, Brockett offered to buy Brown's shares at £1 each. Brown accepted the offer, and on the 9th of the same month gave notice, according to the usual practice, that he had sold his shares to Brockett, to whom he requested them to be transferred. On the first of August he received £75 from Brockett, and handed him his certificate, and afterwards had nothing to do with the company. Brown, in his affidavit, stated that during all the time he was director he never recollected any certificate being produced at the meeting of directors for the purpose of being canceled, and so far as he knew he had complied with all the formalities. There was, however, no entry in the register book, the old certificates had not been canceled, new ones had not been issued, there was no approval of the transfer, and, in short, none of the requisite formalities had been complied with. A clerk, in his affidavit, stated that before 1843 the mode of procedure as to transfers was to give notice to the board of the proposed transfer, and of the name of the purchaser, and, on the purchaser being approved, his name was entered in the register book, the old certificates were canceled, and new ones issued; but after 1843 the proper

number of directors never attended, and the approval was by less number; and in and after 1843 Brockett was himself the entire board.

It is contended in this case that De Walt was the entire board, and he made the dividend, and did all things that were done there without authority from any one.

At the time of Brown's transfer, Brockett, it was alleged, had 100, or at least such a number of shares as, together with Brown's, to exceed the prescribed limit of 100 shares. The significance of that is, by the charter, or some regulation of the company, no one of the members could hold more than 100 shares. And that is the matter of which the master of the rolls talks first in his opinion. Afterwards he says:

"But the circumstance which has materially influenced my judgment, and to which I principally refer in this case, is this: Mr. Brown was one of the directors of the company; he therefore knew that by the eighth clause of the company's deed no business could be properly transacted unless five directors were present, and consequently that it was not in the power of the managing director alone to transact any business of this description for the company. In a former case (and there are other authorities establishing the same principle) I held that a shareholder of the company is not bound to have knowledge of what is contained in the books of the company; that he is not bound by any acquiescence in entries in books, which are merely produced at public meetings, and which he might, if he pleased, then look at; but as regards the directors of a company, the case stands on a totally different footing. A person when he becomes a director accepts a trust which he undertakes to perform for the benefit of the company. If, in the due performance of that trust, he must necessarily have acquired certain knowledge, it appears to me to be but fit that he should be charged with the knowledge of those facts which it was his duty to have become acquainted with. It is merely saying that a person shall be held to know that which it was his bounden duty to know. It appears to me that Mr. Brown was bound to know what took place at the meetings of the board of directors, of which he was a member, and that when he agreed to sell Mr. Brockett seventy-five shares he knew that Mr. Brockett could only hold 100 shares in the company, and that any entry of more was irregular and improper; that it was his duty to know, and that he had the means and opportunity of ascertaining, how many shares Brockett then held; and that he was not entitled to hold seventy-five additional shares. I must hold Mr. Brown to have had knowledge of that which he ought to have known, and whether he had actual knowledge of it or not, is, in my opinion, immaterial for the present purpose."

The other case is from the supreme court of Nebraska.[1] This was an action by the Merchants' Bank against Rudolf and others; and Rudolf, one of the defendants, was a director of the bank. Lewis & Marsh, who were concerned in the transactions out of which the liability of the defendants arose, also had one member of their firm in the bank. Rudolf & Co. pleaded, among other things, that these defendants were sureties, as plaintiff (that is, the bank) well knew; that, after maturity of the note, Lewis & Marsh requested these defendants to become surety on other paper, which they refused to do unless this note had been paid; and, for the purpose of ascertaining this fact in that regard, went to plaintiff's bank, and the cashier there in charge, (stating the purpose of

---

[1] Merchants' Bank v. Rudolf, 5 Neb. 527.

the inquiry,) and inquired in reference to the payment of the note in suit, and were by the cashier informed that the note was all paid except a small balance, against which the bank held ample security; and that Eaton, the cashier, at a number of other times when engaged in the negotiation of business of the bank, to induce these defendants to become surety for Lewis & Marsh on other paper, the proceeds of which went to the bank on account of Lewis & Marsh, said this note had been paid; and that these defendants, in faith of these representations, went upon the paper of Lewis & Marsh in the sum of more than $7,692, on which they have since been required to pay, and have paid, sums amounting to $7,692; that these defendants at the time these representations were made, and for long after, were indebted to Lewis & Marsh in the sum of $6,223, from which indebtedness, but for the faith and credit given to such statements, these defendants could and would have saved themselves harmless, and have paid this note; that this indebtedness these defendants paid to Lewis & Marsh long before any notice that this note was yet unpaid, and Lewis & Marsh, before said notice had become utterly insolvent, and these defendants are remediless, that Lewis & Marsh, after maturity of the note, made large deposits of money and collections with the plaintiff, and that the plaintiff took and held ample collateral security from Lewis & Marsh for the payment of the note, which might have been by the plaintiff realized and retained; and particularly that, just before the note in suit was due, Lewis & Marsh deposited with the plaintiff certificates of deposit of the Washington Bank of Iowa, in the sum of $4,347.35, directed to be collected and credited on the note; that plaintiff knew the defendants to be sureties only, and that plaintiff allowed Lewis & Marsh to check out their moneys, and also applied the proceeds of the Washington Bank certificates to payment of other indebtedness of Lewis & Marsh, without consent or knowledge of defendants, and to their prejudice as sureties, depriving them of their right of subrogation; that Lewis & Marsh are insolvent, and defendants remediless." Now, this defense on the part of strangers to the bank obviously would be perfectly good, and so the court holds; but the defendants were not strangers to the bank, on account of one member of the firm being of the board of directors; and as to their standing in that respect, how this circumstance affected them, the court says:

"But while this is conceded to be the general rule, it is urged on the part of the plaintiff that these defendants are not in a situation to claim its protection, in consequence of the relation which Rudolf bore to the bank, and also to his co-defendant, Deck. It is insisted that, being the last president, and one of the directors of the bank, he was in a situation which required him to know the condition of its business, and must be conclusively presumed to have known whether said note had been paid or not. No case directly in point has been cited, but we apprehend that the rule contended for is the correct one. In Morse on Banks and Banking, it is said that 'the general control and government of all the affairs and transactions of the bank rests with the board of directors. For such purposes the board constitutes the corporation, and uniform usage imposes upon them the general superintendency and active management of the corporate concerns. They are bound to know what is done beyond the merest matter of daily routine, and they are bound to know

the system and rules arranged for its doing. Whatever knowledge a director has or ought to have officially, he has or will be conclusively presumed at law to have, as a private individual. In any transactions with the bank, either on his own separate account or where others are so jointly interested with him that his knowledge is their knowledge, he and his joint contractors will be affected by this knowledge which he has or which he ought, if he had duly performed his official duties, to have acquired.' "

Now, it must be assumed that Mr. Finn, when he became a director of this bank, and its vice-president, and assumed the duty of active management, was advised of the statute which required him to be a stockholder to a certain extent; that is, as to a certain number of shares. It must also be assumed that he had knowledge, or immediately became acquainted with the condition of the books; not only as to whether any shares were held by himself, but who were the stockholders in the bank, —whether there was the requisite number of stockholders, and who they were. Any investigation upon that subject would have led to the discovery that he was a stockholder to the extent of these shares (50.) And therefore, upon the authority of these cases, it must be assumed that he had the knowledge that the shares were standing in his name; and that is a presumption, whether it stands upon estoppel or otherwise, which rests in the general policy in relation to these concerns,—the general policy of the law, which must hold those who are active in setting up and maintaining a corporation to some knowledge of the condition of its affairs. So, also, as to his duty when he became apprised of the condition of things early in January. In the condition of the bank, with a flagrant and most outrageous act of swindling in declaring a dividend of 25 per cent. in an insolvent concern, upon the record of which it must be presumed he had knowledge, it was his duty to repudiate the transfer of these shares at once; he could not allow it to remain for a day. But he allowed his name to stand there, and all he did was to return the money to Mr. De Walt, who he supposed was the owner of these shares; he did not return the money to the bank from whence it came. I do not think the case touches upon the question whether a party shall be charged as a stockholder in a bank or other corporation without his consent. It is conceded that as a stockholder only one cannot be so charged. The authorities are numerous, and stand upon the soundest reason, that if one be put upon the books as a stockholder, without his consent, he shall not be held in respect to such stock; but when he concerns himself in the management of the corporation he vouches for its integrity, stands before the world as indorsing and maintaining it, and he must be liable for whatever the books show in respect to its condition.

The motion for a new trial will be overruled, and judgment entered on the verdict.